UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,            :

      - v -                         :        12 Cr. 849 (AT)

YVETTE RUBIO,                        :

                                        :
------------------------------------X


## YVETTE RUBIO'S SENTENCING MEMORANDUM


                                   DAVID E. PATTON, ESQ.
                                   FEDERAL DEFENDERS OF NEW YORK, INC.
                                   52 Duane Street - 10th Floor
                                   New York, New York 10007

                                   Attorney for YVETTE RUBIO


Sabrina P. Shroff, ESQ.
   *Of Counsel*


TO:   PREET BHARARA, ESQ.
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007
      Attn.:    P. Ian McGinley, ESQ.
                   Assistant United States Attorney

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

August 10, 2015

**BY HAND DELIVERY**

The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 2210
New York, New York 10007

Re:   **United States v. Yvette Rubio**
      **12 Cr. 849 (AT)**

Hon. Judge Torres:

      I write on behalf of my client, Yvette Rubio, in advance of her sentencing, scheduled for August 25, 2015. Ms. Rubio pled guilty to a single count indictment charging her with possessing 146 oxycodone pills, in violation of 21 U.S.C. § 844(a). As a result of her guilty plea, Ms. Rubio faces a Guideline range of zero to six months imprisonment. Ms. Rubio, a 52-year-old grandmother with Generalized Anxiety Disorder, Adjustment Disorder, and Post-Traumatic Stress Disorder, committed this offense because she feared her abusive older brother. Because of the circumstances of Ms. Rubio's upbringing and her limited conduct in this case, I write to respectfully request that the Court sentence Ms. Rubio to time served.

I.    The Standard

      The Guidelines range is but one of many factors set forth in Title 18, United States Code, § 3553(a) that a district court is to consider when imposing sentence. *See generally United States v. Booker*, 543 U.S. 220 (2005). Post-*Booker*, sentencing courts are required to "treat the Guidelines only as a starting point, and then to craft an appropriate sentence taking full account of 'the history and characteristics of the defendant.'" *United States v. Preacely*, 628 F.3d 78, 84 (2d Cir. 2010) (Lynch, J, concurring). Indeed, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (emphasis in original).

      The overarching command of Section 3553(a) is that sentences should be "sufficient, but not greater than necessary" to achieve the basic goals of retribution, deterrence and rehabilitation. To arrive at such a sentence, district courts are directed to

Honorable Analisa Torres  
United States District Court  
Southern District of New York  

August 10, 2015  
Page 2

Re:  United States v. Yvette Rubio  
     12 Cr. 849 (AT)

consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines-range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* 18 U.S.C. § 3553(a).

II.  The Sentence

    A.  *Ms. Rubio's background and characteristics support a sentence of timed served*

Yvette Rubio is a 52-year-old grandmother who suffers from several mood and anxiety disorders. At the behest of her brother Francisco, whom she lives in fear of after decades of abuse, she bought 146 oxycodone pills at his behest. This case has triggered and exacerbated Ms. Rubio's Generalized Anxiety Disorder, Adjustment Disorder, and Post-Traumatic Stress Disorder. In many respects, Ms. Rubio's conduct in this case can be traced to her upbringing.

    1.  Ms. Rubio's childhood

Yvette Rubio was born in the Dominican Republic in 1962. Her mother, Iris Mindalia Montalvo struggled to earn a meager living as a domestic worker. As a result, Ms. Rubio was often tasked with caring for her maternal grandfather, who beat and abused her. Ms. Rubio's father was also a destructive influence: an alcoholic, he took out his anger on his wife and children. In one incident that Ms. Rubio remembers clearly, her father broke both of her mother's legs. *See* Psychological Evaluation by Dr. Rioja at 2, attached as "Exhibit A." Although Ms. Rubio's mother attempted to flee from her abusive husband—and injured herself in the process—she was unable to free herself from her husband's grasp until Ms. Rubio was 18-years-old, when her parents divorced.

Ms. Rubio's early childhood was chaotic and damaging. In addition to the abuse at the hands of her grandfather and father, as discussed below, Ms, Rubio's brothers also physically abused her. And, because of difficult economic circumstances, her family moved around frequently in the Dominican Republic, making it hard for Ms. Rubio to complete her education. She finished the 11th grade, but never graduated high school.

    2.  Moving to America

At the age of 16, Ms. Rubio moved with her brother Francisco to Puerto Rico to

Honorable Analisa Torres                                                                    August 10, 2015
United States District Court                                                                         Page 3
Southern District of New York

Re:     United States v. Yvette Rubio
        12 Cr. 849 (AT)

live with her father. Her father worked as a window washer, and to earn money for her family, Ms. Rubio worked the dangerous job of cleaning windows while suspended from ten-story buildings. The money she earned went to her father.

      Over the next two decades, Ms. Rubio frequently moved around and entered into several destructive relationships. She had her first child in the Dominican Republic when she was 19-years-old. The father left Ms. Rubio before the child was born. Ms. Rubio had her second child after moving to New York in 1986. When she could not find an apartment suitably large enough for her, her mother, and her son, Ms. Rubio slept on the streets, where she met a man who offered to let her family stay with him. She lived with him for eight months, during which he abused Ms. Rubio, broke her bones, and introduced her to cocaine. Ms. Rubio had to escape the apartment to free herself from this man; when she checked herself into the hospital, she discovered that she was pregnant. A few years later, still addicted to cocaine, Ms. Rubio had her third and fourth child with a friend from the Dominican Republic. When she was pregnant with her fourth child, Iris, the father—Juan Carlos—became jealous, and savagely beat Ms. Rubio. He attacked her unborn child with blows from a hammer to her abdomen. Unwilling to abort the injured fetus, Ms. Rubio's daughter Iris was born deaf-mute. Juan Carlos was deported shortly after Iris was born.

      Ms. Rubio beat her five-year addiction to cocaine in 1991, recognizing that she needed to support her children. This sparked a tremendous change for Ms. Rubio, who began to work several jobs as a maid, babysitter, and cook, to support the four children she was raising on her own. She enrolled in welfare programs and obtained public housing. Nevertheless, supporting four children by herself proved to be financially challenging. Although she had quit using drugs a year prior, she made the misguided decision to make money quickly by selling drugs. She was arrested in February 1992 for third degree attempted sale of a controlled substance, was sentenced to five years of probation, and served three years before she was discharged early. While on probation, in 1994, Ms. Rubio had her fifth, and last, child, with another man.

      Despite Ms. Rubio's violent and abusive upbringing, she has resolved to give her children a better life than she had, and by all accounts, she has succeeded remarkably well. *See* Letter from Loren Rubio, attached as "Exhibit B." All of her children graduated from high school. Her daughter Yusan owns a daycare business, which her sister Loren helps with. Her other daughter is a baker at Whole Foods. Ms. Rubio's youngest son, Francisco, is a professional baseball player in the Baltimore Orioles' minor league farm system. Her oldest son has managed the Bronx Bread bakery for several years now, a position he acquired after rising through the ranks of the bakery for nearly two decades.

Honorable Analisa Torres                                       August 10, 2015
United States District Court                                             Page 4
Southern District of New York

Re:   United States v. Yvette Rubio
      12 Cr. 849 (AT)

     Ms. Rubio has pulled herself up from a lifetime of poverty and abuse to raise a family that she is proud of. She is close with all of children, and is a supportive mother and grandmother. As her daughter Loren writes, "Even though she has been through hell [and] back and had her drug addiction and her depressing moments she never abandoned us." *See* Letter from Loren Rubio, attached as "Exhibit B." Ms. Rubio has also become a well-regarded caregiver in her community. She has assisted her daughter Yusan's daycare business, and her clients confirm Ms. Rubio's diligence. *See* Letter from Aracelis Gonzalez, attached as "Exhibit C"; Letter from Lilian Frias, attached as "Exhibit D."

     B.    *Ms. Rubio's limited role in this case supports a sentence of time served*

     As discussed above, Ms. Rubio has been abused by her father, grandfather, siblings, and partners. But it was her older brother Francisco's abuse that has haunted Ms. Rubio the most. As a young child, Francisco would beat Ms. Rubio by grabbing her head and banging it against walls. A few years later, Francisco began using drugs and eventually became completely addicted to crack. His addiction fueled even more violence, directed at Ms. Rubio as well as his own mother. Two incidents illustrate how powerful and destructive Francisco's addiction is. First, during a family funeral, Francisco demanded money from Ms. Rubio to buy more drugs. When she refused to support his addiction, he became infuriated and disrupted the funeral by hurling rocks at the house of the grieving family. Second, when Ms. Rubio returned to the Dominican Republic on a family trip in 2009, she discovered that Francisco had robbed and ransacked her home, selling all of her belongings and furnishings for drug money.

     Because of Francisco's decades of abuse of his younger sister, Ms. Rubio is fearful of her older brother. Yet Ms. Rubio has conflictual feelings towards her brother, and has sent him money to help support him. At times, she feels held captive by her brother's demands. His abuse of Ms. Rubio has resulted in a host of psychological trauma.

     So when her brother called her from Santo Domingo and said he had found a job selling vitamins to people with cancer, she was elated, and thought he had finally found gainful employment. She was happy to do a favor for Francisco—anything to keep him on the right path, away from drugs. When Francisco asked her to obtain Percocet from a pharmacy, she had no idea that it was a prescription drug. Unable to get the Percocet from the pharmacy without a prescription, she told her brother she could not help him. He became angry, and demanded that she find a way to get the Percocet. Francisco called her hundreds of time a day, threatening her, demanding that she get the pills. Francisco even threatened her son with harm if she did not cooperate. Desperate, she found a street dealer of Percocet and bought 146 pills for her brother, acceding to his

Honorable Analisa Torres  
United States District Court  
Southern District of New York

August 10, 2015  
Page 5

Re: <u>United States v. Yvette Rubio</u>  
12 Cr. 849 (AT)

demands.

Ms. Rubio has accepted responsibility for her crime, and recognizes that she never should have gone along with her brother's plan. As Dr. Rioja's psychological evaluation reports, committing this crime has cast a dark cloud of Ms. Rubio. Since her arrest, Ms. Rubio has been prescribed anti-depressants and anti-anxiety medications to cope with the stress that her arrest has caused. She feels deeply remorseful for her actions. But it is clear that Ms. Rubio is not a serious drug dealer or hardened criminal. She was threatened, coerced, and forced to buy these drugs. She had no personal interest in using the drugs, nor did she have any pecuniary interest in their sale. When she found out that obtaining the drugs would be illegal, she initially refused to buy them. It was only after her abusive brother threatened her and her son that she caved to his demands. Ms. Rubio's actions do not reflect the culpability of a ruthless criminal. Her actions, although regrettable, reflect that of a woman backed into a corner, and seeing no other option, chose to follow her brother's command.

Courts in similar situations have displayed significant leniency. Indeed, Ms. Rubio's case is nearly identical to cases in which judges have followed the Federal First Offender Act, offering similar defendants a sentence of pre-judgment probation. In *United States v. Castro*, 10 Cr. 711 (RWS), Judge Sweet sentenced a defendant who sold over 100 oxycodone pills over multiple transactions to prejudgment probation. 2012 WL 1174688, at *2 (S.D.N.Y. Apr. 9, 2012). And in *United States v. Alberto DeJesus Ramirez*, 12 Cr. 926 (PKC), ECF No. 46, Judge Castel granted pre-judgment probation to a defendant who had delivered cocaine. The only thing preventing Ms. Rubio from receiving such a sentence is her February 1992 conviction for third degree attempted sale of a controlled substance, for which Ms. Rubio received five years' probation (and served three, because of her early discharge). This 23-year-old conviction is not representative of Ms. Rubio's character or her criminal propensity. Although Ms. Rubio is not eligible for treatment under the Federal First Offender Act, this Court should references those cases as a comparator to Ms. Rubio's.

C. *The Probation Department's recommended sentence is misguided*

The Probation Department recommends a sentence of a $5,000 fine and 300 hours of community service. This sentence is harsher than necessary to achieve the goals of sentencing. First, the Probation Department attempts to cast doubt on Ms. Rubio's anxiety, writing that the attacks "have not stopped Rubio from conducting her regular day-to-day activities." This assessment is wrong. As Dr. Rioja reported, Ms. Rubio's symptoms, which include feeling depressed every day, "are considered to be clinically significant, as they have interfered with important areas of functioning. They also appear to go beyond an exacerbation of pre-existing generalized anxiety and meet criteria for an

Honorable Analisa Torres  
United States District Court  
Southern District of New York

August 10, 2015  
Page 6

Re: <u>United States v. Yvette Rubio</u>  
12 Cr. 849 (AT)

Adjustment Disorder in relation to her current legal situation." Second, the Probation Department concluded that Ms. Rubio's "involvement was motivated by financial gain." Again, this conclusion is plainly wrong. Ms. Rubio resisted participating in this offense, and only capitulated when her brother threatened her and her son. There is no evidence that Ms. Rubio received any of the proceeds of this offense. Indeed, it was Ms. Rubio who was supporting her brother by sending him money, not Ms. Rubio who was benefiting from her brother's criminal activity.

The Probation Department's recommended sentence would be too harsh for Ms. Rubio. She does not have $5,000 to pay a fine. She is on welfare, lives in public housing, and supports her deaf-mute daughter. Ms. Rubio also would be unable to complete 300 hours of community service. As her psychological assessment makes plain, Ms. Rubio's Post Traumatic Stress Disorder, Generalized Anxiety Disorder, and Adjustment Disorder make leaving her apartment a traumatic and nerve-wracking event. Even today, she does not leave her apartment, but stays home all day and occasionally helps her sister's daycare business, which operates out of the same building Ms. Rubio lives in. Sentencing Ms. Rubio to 300 hours out in the community would be troubling for her mental state. Of course, Ms. Rubio is not opposed to community service in general, but asks that the Court consider her mental health when imposing her sentence.

III. <u>Conclusion</u>

For the reasons set forth above, I respectfully urge the Court to impose a sentence of time served. Under these circumstances, such a sentence will be sufficient, but not greater than necessary, to satisfy all of the purposes of sentencing.

Respectfully submitted,

Steven Marcus  
Legal Intern

Sabrina P. Shroff  
Assistant Federal Defender  
Tel.: (212) 417-8713

cc: Ms. Yvette Rubio  
    AUSA P. Ian McGinley